**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

LYNDA BEIERWALTES, and
WILLIAM BEIERWALTES

      Plaintiffs,

v.

L'OFFICE FEDERALE DE LA CULTURE DE LA CONFEDERATION SUISSE, Federal
Office of Culture of the Swiss Confederation,
L'ADMINISTRATION FEDERALE DES DOUANES DE LA CONFEDERATION SUISSE,
Federal Customs Administration of the Swiss Confederation, and
LA REPUBLIQUE ET CANTON DE GENÈVE, Republic and Canton of Geneva,

      Defendants.

---

## COMPLAINT

---

      Plaintiffs Lynda and William Beierwaltes (collectively "Plaintiffs" or "Beierwaltes"),

through their undersigned counsel, bring this complaint ("Complaint") for declaratory judgment

as to title, conversion, unjust enrichment and civil theft against defendants L'Office fédérale de

la culture de la Confédération Suisse (referred to individually as the "Swiss Office of Culture");

L'Administration fédérale des douanes de la Confédération Suisse (referred to individually as the

"Swiss Customs Administration"); and La République et canton de Genève (referred to

individually as the "Canton of Geneva")[1] (collectively, "Defendants") and allege as follows:

---

[1] Unofficially translated as the "Federal Office of Culture of the Swiss Confederation"; the "Federal Customs
Administration of the Swiss Confederation"; and the "Republic and Canton of Geneva," respectively.

## NATURE OF THE ACTION

1.      The Beierwaltes are art enthusiasts. They have, for most of their adult lives,

acquired, managed, and sold an extremely extensive and valuable body of fine art and

antiquities. Over the years, they have found a great deal of personal satisfaction and enjoyment

in the business of buying, displaying, and selling works of fine art and antiquities. They have a

long history as collectors, and their home once served as their gallery. By the late 1990s, the

Beierwaltes' collection was considered one of, if not, the finest private collections of antiquities

in the United States.

2.      This case concerns 18 antiquities belonging to the Beierwaltes, which are located

in Geneva, Switzerland (the "Beierwaltes Property"). The Beierwaltes Property is primarily of

Greek, Roman and Egyptian origin and has a fair market value in the aggregate of approximately

$8 million. Originally, the Beierwaltes displayed the Beierwaltes Property at their home in

Loveland, Colorado. However, after determining that the Beierwaltes Property should be sold,

the Beierwaltes consigned the Beierwaltes Property to a gallery run by their exclusive art dealer

in Geneva, Switzerland.

3.      The Defendants violated international law by wrongfully seizing[2] the Beierwaltes

Property at a Geneva warehouse on February 28, 2017, and by failing to pay the Beierwaltes just

compensation for these objects.

---

[2] The Defendants have not removed the Beierwaltes Property from the Geneva warehouse in which it is stored.
Beginning in February 2017, as explained in detail below, the Defendants took concerted action pursuant to the
applicable Swiss statute against the Beierwaltes and their exclusive art dealer that has "frozen" the Beierwaltes
Property. Because this action amounts to a seizure of the property, the Complaint uses the terms "freeze," "seize,"
"seizure," and their derivations interchangeably.

4.     Through their communications with the Beierwaltes' counsel, Defendants have failed to assert any proper legal basis for the seizure of the Beierwaltes Property pursuant to international or Swiss law. Both the Ministère public du canton de Genève (the "Geneva Prosecutor"),[3] which operates pursuant to authority vested by the Canton of Geneva, and the Swiss Customs Administration have asserted that the *Code pénal suisse* (the "Swiss Penal Code") provides the basis for seizure, but they have failed to cite any provision under that statute to support this assertion. The Geneva Prosecutor and the Swiss Customs Administration attempt to avail themselves of the *Loi fédérale sur le transfert international des biens culturels, LTBC, du 20 juin 2003* (the "LTBC"),[4] Switzerland's law governing the international transfer of cultural property, which the Swiss Office of Culture administers, but they also have failed to cite any provision under that statute as support.

5.     No individual or foreign sovereign, and no other third party, has asserted any claim of ownership whatsoever over the Beierwaltes Property. Instead, Defendants simply seized the Beierwaltes Property without valid legal basis or justification. Upon information and belief, Defendants intend to solicit as-yet-unidentified third parties to whom the Beierwaltes Property will be "repatriated." To put it plainly, Defendants' actions amount to a seizure in search of a crime.

6.     Plaintiffs respectfully seek (i) a declaratory judgment that title to the Beierwaltes Property belongs solely to the Beierwaltes, because no individual or foreign sovereign or any other third party has asserted any claim of ownership as to the Beierwaltes Property, and (ii) a

---

[3] Unofficially translated as the "Ministry of Public Affairs of the Canton of Geneva."

[4] Unofficially translated as the "Federal Act on the International Transfer of Cultural Property, CPTA, dated June 20, 2003."

judgment in the Beierwaltes' favor on their claims of conversion, unjust enrichment, and civil theft against the Defendants, who have expropriated the Beierwaltes Property for their own political benefit and to the detriment of the Beierwaltes without just compensation in clear violation of the LTBC and of the underlying 1970 Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property (the "UNESCO Convention").[5]

7.      This action is ripe for judgment:   there now exists an actual and justiciable controversy between the parties that is capable of judicial resolution.

## THE PARTIES

8.      Plaintiffs are citizens of the State of Colorado and residents of Larimer County.

9.      Defendant Swiss Office of Culture, whose principal offices are located in Bern, Switzerland, is an administrative unit of the Swiss government's Federal Department of Home Affairs and an instrumentality of the Swiss government. The Swiss Office of Culture is responsible for promoting Swiss culture and preserving Switzerland's cultural heritage. Its mission includes advising and aiding all prosecutions and seizures under Section 7, Article 18 of the LTBC. It also includes an extensive role in the import of cultural property. Specifically, the Office of Culture oversees and regulates the procedures for the import and seizure of cultural artifacts such as the Beierwaltes Property.

---

[5] Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property, Paris, 14 November 1970. The UNESCO Convention is the leading convention governing the international transfer of antiquities and other cultural property. One-hundred thirty-seven nations have accepted or acceded to UNESCO and have become "State Parties" thereunder, including the United States and Switzerland. United Nations Education, Scientific and Cultural Organization (UNESCO), *States Parties: Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property*, *available at* http://www.unesco.org/eri/la/convention.asp?KO=13039&language=E&order=alpha (last visited June 25, 2018).

10.     Defendant Swiss Customs Administration, whose principal offices are located in Bern, Switzerland, is an administrative unit of Switzerland's Federal Department of Finance and an instrumentality of the Swiss government. It is responsible for, among other tasks, the control of the import and export of certain goods, border security, and the imposition of customs duties. Pursuant to the LTBC,[6] the Swiss Customs Administration acts at the direction of, and in concert with, the Swiss Office of Culture in matters arising under the LTBC, including the seizure of the Beierwaltes Property.

11.     Defendant Canton of Geneva, a territorial division in Switzerland, vests authority in the Geneva Prosecutor to prosecute criminal acts occurring within the jurisdiction of the Canton of Geneva. Pursuant to the LTBC,[7] the Canton of Geneva acts at the direction of, and in concert with, the Swiss Office of Culture in all prosecutions arising under the LTBC in the Canton of Geneva, including the seizure of the Beierwaltes Property.

## JURISDICTION AND VENUE

12.     Subject to existing international agreements to which the United States is a party, the Foreign Sovereign Immunities Act ("FSIA") provides an exception to the general immunity from suit granted to foreign states under 28 U.S.C. § 1604 where an agency or instrumentality of the foreign state, which engages in commercial activity in the United States, seizes property held by a United States citizen under circumstances such as those presented in this case without just compensation in violation of international law. 28 U.S.C. § 1605(a)(3). This exception to the FSIA applies here, and thus the Defendants are not immune from suit in this Court.

---

[6] *See* LTBC Articles 18, 19 and 21.

[7] *See* LTBC Articles 17, 18, 20 and 21.

**A.      Defendants are not immune from suit under 28 U.S.C. § 1605(a)(3).**

13.     The Court has subject-matter and personal jurisdiction over the Defendants under 28 U.S.C. § 1330 because the Defendants are not entitled to immunity under 28 U.S.C. § 1605.

14.     A foreign state and its agencies and instrumentalities are not immune from suit under the FSIA where "rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

15.     Defendants' seizure of the Beierwaltes Property without paying just compensation violates international law.

16.     This action concerns rights in the Beierwaltes Property that were arbitrarily taken from the Beierwaltes without just compensation paid.

17.     The Swiss Office of Culture is an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b).

18.     The Swiss Customs Administration is an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b).

19.     The Canton of Geneva is an agency or instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b).

20.     Upon information and belief, The Swiss Office of Culture is engaged in commercial activity in the United States, including the following:

a.      The Swiss Office of Culture coordinates all cultural activities of the Swiss government, including the Swiss National Library, multiple museums, and other cultural

programs. The Swiss Office of Culture's activities include promoting Swiss culture in the United States for the purpose of boosting economic and cultural exchange between the United States and Switzerland.

b.      The Swiss Office of Culture, through the many national museums it operates, regularly purchases art from United States artists and museums.

c.      The Swiss Office of Culture, through the many national museums it operates, also regularly places exhibits on temporary display in the United States. For example, the Swiss Office of Culture through the Museum Oskar Reinhart am Stadtgarten, which it operates, has profited from exhibiting artwork in United States museums. From February to April 1994, the Museum Oskar Reinhart am Stadtgarten placed on temporary exhibition over 150 paintings and drawings at the Metropolitan Museum of Art in New York in an exhibition entitled, "Caspar David Friedrich to Ferdinand Hödler: A Romantic Tradition." The same exhibition was on display in the Los Angeles County Museum of Art from September 1993 to January 1994. Through ticket sales and related sale of merchandise, the Swiss Office of Culture profited from these exhibitions.

d.      The Swiss Office of Culture also actively promotes Swiss film to American audiences. In 2016, for example, the Swiss Office of Culture entered a film entitled "Iraqi Odyssey" in the United States Academy Awards.

e.      Each year, the Swiss Office of Culture awards monetary prizes to artists to recognize cultural achievement. The Swiss Office of Culture regularly awards these prizes to artists residing and working in the United States. In 2017, for example, the

Swiss Office of Culture awarded a Swiss Art Award to Tobias Madison, who lives and works in New York. And in 2016, the Swiss Office of Culture awarded a Swiss Design Award to Christophe Guberan, who lives and works in Boston.

  f. Through its various cultural activities in the United States, the Swiss Office of Culture promotes Swiss cultural enterprises in the United States. This constitutes commercial activity within the meaning of 28 U.S.C. § 1605(a)(3).

  21. Upon information and belief, the Swiss Customs Administration acts at the direction of, and in concert with, the Swiss Office of Culture in matters arising under the LTBC.

  22. Upon information and belief, the Canton of Geneva acts at the direction of, and in concert with, the Swiss Office of Culture in matters arising under the LTBC in the Canton of Geneva.[8]

  23. The commercial activity of the Swiss Office of Culture is attributable to the Swiss Customs Administration and the Canton of Geneva in this matter because, as explained below, the Swiss Office of Culture has initiated and overseen the seizure of the Beierwaltes Property. The Swiss Office of Culture administers prosecutions arising under the LTBC, which is the alleged legal basis for seizure of the Beierwaltes Property. The Swiss Office of Culture invoked the LTBC when it issued the complaint giving rise to the seizure of the Beierwaltes Property.

---

[8] Concerted action between these Swiss agencies is required by Swiss law. The LTBC mandates the interagency relationship between the Federal Office of Culture, on the one hand, and the Swiss Customs Administrator and the Geneva Prosecutor, on the other. Specifically, articles 17, 19, 20 and 21 of the LTBC expressly require the Geneva Prosecutor and the Swiss Customs Administration to act at the direction of the Federal Office of Culture. *See* LTBC, art. 17 ("When [a body of the Federal Office of Culture] has reasonable suspicion that criminal activity is present under this Act, the specialized body will file a complaint with the competent prosecution authorities."); *id.* art. 19 (requiring the Swiss Customs Administration to inspect antiquities upon entry to the country); *id.* art. 20 § 1 (requiring "competent criminal prosecution authorities" to order the seizure of cultural property referred by the Federal Office of Culture); *id.* art. 21 ("The competent authorities from the . . . Cantons . . . provide all the data required for the execution of this Act to each other as well as the appropriate oversight authorities.").

The Swiss Customs Administration and the Canton of Geneva have effectuated the mandates of that complaint by issuing documentation and implementing the seizure.

**B.      Venue is Proper in the District of Colorado under 28 U.S.C. § 1391(f)(1).**

24.      Venue is proper in this district under 28 U.S.C. § 1391(f)(1) because a substantial part of the events giving rise to the claim occurred here.

<u>INTERNATIONAL LAW BACKGROUND</u>

25.      The United States is a signatory ("State Party") to the UNESCO Convention. The United States implemented the UNESCO Convention by enacting the Convention on Cultural Property Implementation Act ("CPIA"), which became effective on April 12, 1983. Switzerland—and, by extension, Defendants as instrumentalities of the government of Switzerland or a territorial division in Switzerland—became a State Party under the UNESCO Convention in 1975 and implemented it by enacting the LTBC, which became effective on June 20, 2003. Defendants purport to have seized the Beierwaltes Property with a view to repatriating it to certain additional State Parties or other third parties, which have not yet even been identified and which have not asserted any claim to or ownership interest in the Beierwaltes Property. Hence, Defendants' conduct is a clear violation of the UNESCO Convention and the rights of the Beierwaltes, who are the true, lawful and exclusive owners of the Beierwaltes Property.

26.      The UNESCO Convention provides that a State Party requesting the return of cultural property imported after the entry into force of the UNESCO Convention shall pay just

compensation to an innocent purchaser or to a person with valid title to the property.[9] Greece, Italy and Egypt—the countries to which the Defendants presumably would seek to repatriate the Beierwaltes Property because the Beierwaltes Property is of Greek, Roman, and Egyptian origin—are each State Parties as well and similarly would be bound by the requirement to pay the Beierwaltes just compensation for the Beierwaltes Property.

27.     By seizing the Beierwaltes Property, the Geneva Prosecutor necessarily invoked the Swiss Penal Code as a basis for the seizure. Despite requests by the Beierwaltes' counsel to provide them legal support for the seizure, the Geneva Prosecutor failed to cite any provision under the Swiss Penal Code justifying the seizure. By its unauthorized action, the Geneva Prosecutor has violated both Swiss and international law.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**A.      The Beierwaltes Property and Related Proceedings**

28.     The Beierwaltes are a married couple who, since the 1990s, have been involved in the curation, display, publication and sale of a valuable collection of antiquities. Most of these antiquities originated from ancient Greek, Roman and Egyptian civilizations within their cultural ambit.

29.     By the early 2000s, the Beierwaltes suffered a reversal of fortune and decided to liquidate their antiquities collection to satisfy the claims of creditors. To that end, they developed a relationship with the premier international dealer of high-value antiquities, Phoenix Ancient Art S.A. ("Phoenix"), with galleries located in Geneva, Switzerland and a gallery in New York

---

[9] UNESCO Convention, Article 7(b)(ii). *See infra* n.17, and accompanying text, regarding the requirement to pay just compensation under the bilateral agreements entered pursuant to the LTBC between Switzerland and each of Italy, Egypt and Greece.

City owned and managed by Electrum, an affiliated entity acting as the exclusive agent for Phoenix ("Electrum").

30.     In June 2006, the Beierwaltes entered into an Exclusive Dealer Agreement with Phoenix (the "Exclusive Dealer Agreement"), granting Phoenix the exclusive right to sell their antiquities collection. The Exclusive Dealer Agreement lists the Beierwaltes' inventory of antiquities and includes the Beierwaltes Property.

31.     One of the Beierwaltes creditors is Bill R. Putman, a resident of the State of Colorado. In April 2013, Mr. Putman obtained a judgment against the Beierwaltes of approximately $5 million. To satisfy this judgment, the Beierwaltes faced the prospect of a fire-sale liquidation of their assets, including their antiquities. To avert this result and preserve the value of their assets for the benefit of them and their creditors, on May 21, 2013, the Beierwaltes filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Colorado. On April 7, 2014, the Beierwaltes filed a Disclosure Statement for Plan of Reorganization (the "Plan").[10]

32.     The Plan listed the Beierwaltes' collection of antiquities as the couple's most valuable asset. The Bankruptcy Court appointed Phoenix as the bankruptcy estate's designated antiquities dealer to sell the Beierwaltes' collection for the benefit of the estate's creditors, and the Bankruptcy Court confirmed the Exclusive Dealer Agreement for this purpose. Pursuant to the Plan and the Exclusive Dealer Agreement, the Beierwaltes consigned their antiquities collection to Phoenix for sale.

---

[10] *See* Plan of Reorganization, dated April 7, 2014, Case No. 13-18655-SBB, U.S. Bankruptcy Court, D. Colo., Dkt. Nos. 185 & 186.

33.     The bankruptcy proceeding ultimately settled, the Chapter 11 petition was dismissed, and the liens of the secured creditors were satisfied. Phoenix was able to sell some, but not all, of the Beierwaltes' antiquities and generate proceeds for the benefit of the Beierwaltes' creditors. The remaining unsold 18 objects now constitute the Beierwaltes Property and were in Phoenix's possession in Geneva at the time of their seizure by the Geneva Prosecutor and the Swiss Customs Administration.

34.     Mr. Putman, however, was unable to benefit fully from the settlement of the bankruptcy proceeding. Following the settlement, the Beierwaltes still owed Mr. Putman approximately $3.67 million. At this time, approximately $1.8 million of his judgment remains unsatisfied. Prior to Defendants' unlawful actions, the Beierwaltes were still engaged with Phoenix pursuant to the Exclusive Dealer Agreement to sell the Beierwaltes Property, whose proceeds would be used to satisfy Mr. Putman's judgment. Defendants' unlawful seizure of the Beierwaltes Property, however, has thwarted the efforts by Phoenix and the Beierwaltes to make a citizen of this state financially whole.

**B.      The Unlawful Seizure of the Beierwaltes Property**

35.     On January 17, 2017, the Swiss Office of Culture presented the Swiss Customs Administration with a complaint identifying seven antiquities, none of which belongs to the Beierwaltes, whose provenance[11] is allegedly in question. Certain parties had been under

---

[11] In the art world, the term "provenance" is commonly understood to mean an art work's history of ownership or chain of title. *See* Provenance, Oxford English Dictionary (3d ed. 2007) ("The history of the ownership of a work of art or an antique, used as a guide to authenticity or quality; a documented record of this."). The term "provenience" is commonly understood to mean an object's country of origin or archeological place of discovery or "find spot." *See* Provenience, Oxford English Dictionary (3d ed. 2007) ("Origin, derivation."). Like other art work, but unlike other asset classes such as real estate or securities, the ownership and transfer of antiquities historically never has been recorded in any title registries or transfer ledgers. Thus, as with other movable personal property, the

investigation by the Geneva Prosecutor in connection with the purchase, possession and concealment of archaeological objects suspected of having been acquired, transported and possessed contrary to Swiss law. The objects were stored in Geneva in a warehouse, which Phoenix partly controlled.

36.     On February 24, 2017, the Geneva Prosecutor issued an Ordonnance de Perquisition et de Séquestre—a search warrant to seize these objects.[12] The Ordonnance refers to the complaint—the "denunciation de l'Office federal de la Culture"—given by the Swiss Office of Culture to the Swiss Customs Administration on January 17, 2017.  Four days later, on February 28, 2017 the Swiss Customs Administration issued a Mandat de perquisition, its own seizure order, and seized 111 objects from the Geneva warehouse.[13] The Beierwaltes Property is among the 111 objects that were seized.

37.     The Beierwaltes Property includes the following 18 antiquities:

a.     A bronze figure of an attacking lion of Greek origin;

b.     A marble head of a man of Greek origin;

c.     A large terracotta standing figure of Greek origin;

d.     A composite seated divinity of Mesopotamian origin;

---

determination of the provenience and provenance of such as antiquities is often uncertain, imprecise and unknowable. The LTBC acknowledges this reality. Article 16 of the LTBC imposes a duty of diligence on "persons active in the art trade and auctioning." Among other things, Section (c) of the second sentence of Article 16 requires such persons to "maintain written records on the acquisition of cultural property by specifically recording the origin of the cultural property, *to the extent known* . . . ." It is unclear whether persons subject to Article 16 include both art dealers and consignors; it is similarly unclear whether the Beierwaltes are currently subject to Article 16 given the reduced scope of their remaining holdings of antiquities and their status as passive sellers. What is clear, however, is that both the Beierwaltes and Phoenix have satisfied all elements of the duty of diligence under Article 16 of the LTBC with respect to the Beierwaltes Property. *See infra* n.14 and accompanying text.

[12] *See* Geneva Prosecutor search warrant, dated February 24, 2017, annexed hereto as "Exhibit A."

[13] *See* Swiss Customs Administration seizure order, executed February 28, 2017, annexed hereto as "Exhibit B."

e.      A complete mosaic floor from a villa of Roman origin;

f.      A bronze Pegasus protome of Greek origin;

g.      A terracotta pair of protomes of Greek origin;

h.      A fine serpentine bust of Maat of Egyptian origin;

i.      A bronze figure of Osiris of Egyptian origin;

j.      A large alabaster jar of Mesopotamian origin;

k.      A bronze ram protome of Greek origin;

l.      A marble head of a ram of Greek origin;

m.      A bronze figure of a reclining goat of Greek origin;

n.      An outstretched hare of Greek origin;

o.      A faience figure on a lion throne of Greek origin;

p.      An Apulian flask in the shape of a monkey face of Greek origin;

q.      A vase in the shape of a phallus of Greek origin;

r.      An Ionian phallus of Greek origin;

38.     Although the complaint of the Swiss Office of Culture issued for execution to the

Swiss Customs Administration refers to seven objects whose provenance is in question as the

basis for the seizure, none of the items constituting the Beierwaltes Property is identified as

being among those seven objects. Notwithstanding the complete absence of any specific

information linking the Beierwaltes Property to any Swiss customs violation or other offense, the

Swiss Customs Administration's seizure order unequivocally states that the seizure is being

executed for the purpose of restitution, confiscation and satisfaction of any claims. Shockingly,

Defendants propose to expropriate the Beierwaltes Property and deliver it to one or more yet-to-

14

be-determined foreign countries, even without any challenge to the provenance of any of the objects included in the Beierwaltes Property or any determination as to the provenience of the objects. In other words, Defendants are bartering the Beierwaltes Property for their own political gain.

39.     By letter dated May 7, 2018 to the Geneva Prosecutor, New York counsel for the Beierwaltes demanded the immediate release of the Beierwaltes Property (the "May 7th Letter"). In support of the Beierwaltes' position that the seizure was made illegally, counsel explained that the Beierwaltes Property had been purchased from leading, well-known international art dealers in New York and London, as well as from prominent international auction houses. In each case, the Beierwaltes were *bona fide* purchasers for value with no notice of any adverse claims by any third party, including those of any country of origin. The Beierwaltes purchased each object in reliance on express or implied representations from reputable dealers and auction houses in the absence of any thefts reported to publicly available databases of stolen art, such as the Art Loss Register. In purchases from dealers in the United States, the Beierwaltes also relied on statutory warranties of title and merchantability under the Uniform Commercial Code ("UCC"). In purchases at public auction, the Beierwaltes relied on warranties of title and "authorship" from the auction house.[14]

---

[14] *See* Letter, dated May 7, 2018, from Pearlstein McCullough & Lederman LLP to Claudio Mascotto, Procureur, Pouvoir judiciare, Ministère public, annexed hereto as "Exhibit C." The first sentence of LTBC Article 16 provides that "persons active in the art trade and auctioning" can transfer cultural property only when the transferor "may assume under the circumstances, that the cultural property was not stolen, illegally excavated or illicitly imported." Upon information and belief, neither Phoenix nor the Beierwaltes have ever had any "red flags" of illegality with respect to the Beierwaltes Property and each has at all times satisfied the requirements of LTBC Article 16 with respect to the Beierwaltes Property.

40.     Counsel further explained to the Geneva Prosecutor that Phoenix, which has partial control over the warehouse from which the Beierwaltes Property was seized, had been contracted as the Beierwaltes' exclusive art dealer to assist the Beierwaltes in marketing and selling their art collection to raise funds for the payment to creditors. By seizing the Beierwaltes Property, the Geneva Prosecutor has prevented Phoenix from marketing and selling the Beierwaltes Property, thwarting the ability of the Beierwaltes to pay Mr. Putman, their Colorado-based judgment creditor. Counsel requested that the Geneva Prosecutor set forth the legal basis for his actions.

41.     By letter dated May 11, 2018, the Geneva Prosecutor responded to counsel's May 7th Letter (the "May 11th Letter").[15]  Without presenting any supporting evidence or citing any applicable provision under the Swiss Penal Code, the Geneva Prosecutor stated that the Beierwaltes Property is suspected of being in violation of the LTBC. The Geneva Prosecutor further stated that he seeks to depose the Beierwaltes in Geneva. Once again, however, he provided no basis under either Swiss or international law for the questioning of a United States citizen in the absence of any formal legal proceedings pending before any court or tribunal.

42.     By letter dated June 6, 2018, counsel responded to the Geneva Prosecutor's May 11th Letter (the "June 6th Letter").[16] Counsel indicated that the Geneva Prosecutor failed to provide any legal basis for his actions and made only vague, unsupported allegations of suspected violations of the LTBC. Counsel further noted that it appears that the Beierwaltes

---

[15] *See* Letter, dated May 11, 2018, from Claudio Mascotto, Procureur, Pouvoir judiciare, Ministère public, to Pearlstein McCullough & Lederman LLP, annexed hereto as "Exhibit D."

[16] *See* Letter, dated June 6, 2018, from Pearlstein McCullough & Lederman LLP to Claudio Mascotto, Procureur, Pouvoir judiciare, Ministère public, annexed hereto as "Exhibit E."

Property is being held for an indeterminate period, at the end of which the objects will be repatriated to some arbitrarily selected countries of origin at the discretion of the Geneva Prosecutor.[17] Finally, counsel reiterated its demand that the Geneva Prosecutor immediately and unconditionally release the Beierwaltes Property and that the failure to do so would prompt the filing of the instant action.

---

[17] Article 9 of the LTBC provides for "Repatriation Claims based on Agreements." Pursuant to the LBTC, Switzerland has entered into bilateral agreements with Italy (effective April 27, 2008); Egypt (effective February 20, 2011); and Greece (effective April 13, 2011). *See Bilateral Agreements to the LTBC*, Federal Office of Culture, *available at* https://www.bak.admin.ch/bak/en/home/cultural-heritage/transfer-of-cultural-property/bilateral-agreements.html (last visited July 24, 2018).

These agreements respectively provide, among other things, for restitution of antiquities illegally excavated from Italy, Egypt and Greece. These are the three countries to which Switzerland would presumably return the Beierwaltes Property. Article 9 imposes substantial hurdles on a country demanding restitution. Among other things, the claimant must show that the cultural property is of "significant importance to its cultural heritage" and was imported illicitly (of which there is no indication here); the claimant must carry the costs of repatriation; claims are subject to a one-year statute of limitations after the claimant gains knowledge of where and with whom the property is located, subject to a maximum of 30 years after illegal export; and good-faith purchasers required to return property have a claim for compensation at the time of repatriation, with the owner retaining the property until payment. Each of the bilateral agreements generally reflects these hurdles (*see* Italian agreement Article IV(3) and V(2); Egyptian agreement Article 4(5) and 6; Greek agreement Article IV(2) and V(2)). Each of the bilateral agreements also provides that the claimant must demonstrate that the object was illicitly imported into Switzerland after the effective date of such agreement (*see* Italian agreement Article IV(1)(b); Egyptian agreement Article 4(4); Greek agreement Article IV(1)(b)).

Upon information and belief, the Beierwaltes exported three of the 18 objects included in the Beierwaltes Property from Colorado directly to Phoenix in August and October 2006, prior to the effective date of any of the bilateral agreements. Upon information and belief, the Beierwaltes exported the remaining 15 objects included in the Beierwaltes Property from Colorado to Electrum in New York on various dates between June 2006 and September 2011, and Electrum exported these objects on various dates after receipt to Phoenix in Geneva. Any objects imported to Switzerland prior to the effective date of the applicable bilateral agreement are exempt from a claim thereunder. Under the circumstances, it is hard to see how Italy, Greece or Egypt could make a successful claim under LTBC Article 9 or their respective bilateral agreements for the return of any of the Beierwaltes Property. Even if they managed to overcome the hurdles imposed by Article 9 and the bilateral agreements, it is clear that the Beierwaltes are good-faith purchasers who would be entitled to retain their property pending payment by the claimant. *See Bilateral Agreements to the LTBC*, Federal Office of Culture, *available at* https://www.bak.admin.ch/bak/en/home/cultural-heritage/transfer-of-cultural-property/bilateral-agreements.html (last visited July 24, 2018).

43.     By letter dated June 12, 2018, the Geneva Prosecutor responded to counsel's June 6th Letter.[18] The Geneva Prosecutor explained that the Beierwaltes Property was seized while in possession of a third party and that the Beierwaltes should reach out to this third party to intercede on their behalf. The Geneva Prosecutor renewed his demand for the production of any documents pertaining to the Beierwaltes Property; only then would his office undertake further review as to the continued detention of the Beierwaltes Property. The Geneva Prosecutor reiterated that this matter is subject to Swiss criminal procedure law, though he omitted any references to such law specifically justifying the seizure and freezing of the Beierwaltes Property.

44.     To date, the Beierwaltes Property has not been released and remains in the exclusive possession of the Defendants. As a result, the Beierwaltes and their Colorado-based judgment creditor have been deprived of the use and enjoyment, and proceeds, of the Beierwaltes Property. This ongoing illegal and arbitrary deprivation has caused the Beierwaltes and their Colorado-based judgment creditor substantial monetary injury.

## COUNT I

### Declaratory Judgment as to Title

45.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in Paragraphs "1" through "44" of this Complaint with the same force and effect as if herein set forth in full.

---

[18] *See* Letter, dated June 12, 2018, from Claudio Mascotto, Procureur, Pouvoir judiciare, Ministère public, to Pearlstein McCullough & Lederman LLP, annexed hereto as "Exhibit F."

46.     The Beierwaltes purchased all objects that constitute the Beierwaltes Property from leading, well-known international art dealers in New York and London, as well as from prominent international auction houses.

47.     The Beierwaltes are *bona fide* purchasers for value of the Beierwaltes Property with no notice of any adverse claims by any third party, including those of any country of origin or State Party.

48.     The Beierwaltes purchased all objects that constitute the Beierwaltes Property in reliance on express or implied representations from reputable dealers and auction houses and in reliance on the absence of any thefts reported to publicly available databases of stolen art, such as the Art Loss Register.

49.     In purchases from dealers in the United States of those objects that constitute, in part, the Beierwaltes Property, the Beierwaltes also relied on statutory warranties of title and merchantability under the UCC.

50.     In purchases at public auction of those objects that constitute, in part, the Beierwaltes Property, the Beierwaltes relied on warranties of title and "authorship" from the auction house.

51.     No individual, foreign sovereign, State Party or any other third party has asserted any claim to, ownership interest in or rights to the Beierwaltes Property pursuant to UNESCO or otherwise, based on a violation of its own or any other law.

52.     Switzerland has no claim to, ownership interest in or rights to the Beierwaltes Property pursuant to UNESCO or the LTBC.

53.     No individual, foreign sovereign, State Party, or any other third party has presented any evidence disputing the provenance of the Beierwaltes Property.

54.     Defendants have failed to offer any factual or legal support justifying the seizure, retention and prospective repatriation to source countries of the Beierwaltes Property.

55.     The Beierwaltes are the true, lawful and exclusive owners of the Beierwaltes Property.

56.     To the extent that any party, including the Swiss Office of Culture, the Swiss Customs Administration, and the Canton of Geneva, claims any interest in the Beierwaltes Property, such claim is without foundation or right and is void as a matter of law.

57.     The Beierwaltes request that the Court enter an Order declaring the Beierwaltes to be the true, lawful, and exclusive owners of the Beierwaltes Property and requiring the Defendants to relinquish possession of the Beierwaltes Property and immediately return the Beierwaltes Property to the Beierwaltes' exclusive art dealer, Phoenix, for purposes of unrestricted marketing and sale (including import to and export from Switzerland).

## COUNT II

### Conversion

58.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in Paragraphs "1" through "57" of this Complaint with the same force and effect as if herein set forth in full.

59.     The Beierwaltes are *bona fide* purchasers for value of the Beierwaltes Property.

60.     The Beierwaltes are the true, lawful and exclusive owners of the Beierwaltes Property.

61.     No individual, foreign sovereign, State Party, or any other third party has asserted any claim to, ownership interest in or rights to the Beierwaltes Property.

62.     Switzerland has no claim to, ownership interest in or rights to the Beierwaltes Property.

63.     By seizing and freezing the Beierwaltes Property, Defendants have deprived the Beierwaltes of their right and ability to market and sell, through Phoenix as their exclusive art dealer, the Beierwaltes Property, whose proceeds are intended for the benefit of the Beierwaltes' judgment creditor in the United States, specifically in Colorado.

64.     By seizing the Beierwaltes Property, Defendants have exercised dominion and control over the Beierwaltes Property, including by expropriating it for their own use and political purpose, namely the prospective repatriation of the Beierwaltes Property to as yet undetermined and unidentified source countries at Defendants' sole discretion.

65.     Defendants' actions constitute a *de facto* forfeiture of the Beierwaltes Property without due process and in violation of international law.

66.     Defendants' exercise of dominion and control over the Beierwaltes Property was unauthorized.

67.     The Beierwaltes, through their counsel, demanded the return of the Beierwaltes Property.

68.     Defendants refused to return the Beierwaltes Property.

69.     The Beierwaltes are entitled to damages representing the full amount of the aggregate fair-market value of the Beierwaltes Property.

70.    Consequently, the Beierwaltes have been damaged in the amount of at least $8 million, together with statutory interest.

## COUNT III

### Unjust Enrichment

71.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in Paragraphs "1" through "70" of this Complaint with the same force and effect as if herein set forth in full.

72.    The Beierwaltes are the true, lawful and exclusive owners of the Beierwaltes Property.

73.    No individual, foreign sovereign, State Party, or any other third party has asserted any claim to, ownership interest in or rights to the Beierwaltes Property.

74.    Switzerland has no claim to, ownership interest in or rights to the Beierwaltes Property.

75.    By seizing the Beierwaltes Property, Defendants have received a benefit, including having expropriated the Beierwaltes Property for their own use and political or other purpose, namely the prospective repatriation to source countries of the Beierwaltes Property. Defendants are bartering the Beierwaltes Property for their own political gain.

76.    By expropriating the Beierwaltes Property for their own use and political purpose, Defendants have been unjustly enriched, at the Beierwaltes' expense, by continuing to possess property to which they have no claim, interest or right.

77.    Defendants' actions constitute a *de facto* forfeiture of the Beierwaltes Property without due process and in violation of international law.

78.     Equity and good conscience demand that the Defendants pay damages to the Beierwaltes because Defendants' unlawful seizing and prospective repatriation of the Beierwaltes Property make it unjust for Defendants to retain the benefit of their actions without just and commensurate compensation to the Beierwaltes.

79.     The Beierwaltes are entitled to damages representing the full amount of the aggregate fair-market value of the Beierwaltes Property.

80.     Consequently, the Beierwaltes have been damaged in the amount of at least $8 million, together with statutory interest.

## COUNT IV

### Civil Theft

81.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in Paragraphs "1" through "80" of this Complaint with the same force and effect as if herein set forth in full.

82.     The Beierwaltes are the true, lawful and exclusive owners of the Beierwaltes Property.

83.     No individual, foreign sovereign, State Party, or any other third party has asserted any claim to, ownership interest in or rights to the Beierwaltes Property.

84.     The Defendants have no claim to, ownership interest in or rights to the Beierwaltes Property. By seizing the Beierwaltes Property, Defendants have expropriated it for their own use and political or other purpose, namely the prospective repatriation to undetermined foreign countries of the Beierwaltes Property.

85.     The Defendants knowingly obtained control over the Beierwaltes Property without authorization and in violation of international law.

86.     The Defendants seized the Beierwaltes Property intending to deprive permanently the Beierwaltes of the benefit and use of the Beierwaltes Property, including by repatriating the Beierwaltes Property to source countries or other third parties.

87.     Under Colorado law, the Beierwaltes are entitled to recovery of three times the amount of their actual damages.

88.     The Beierwaltes have been damaged in the amount of at least $8 million. Consequently, the Beierwaltes are entitled to recover damages in the amount of at least $24 million, together with statutory interest, attorneys' fees and costs.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in favor of Plaintiffs as follows:

(A)     On Count I of the Complaint, a declaratory judgment that the Beierwaltes are the true, lawful and exclusive owners of the Beierwaltes Property, and that Defendants must relinquish possession of the Beierwaltes Property and immediately return the Beierwaltes Property to the Beierwaltes' exclusive art dealer, Phoenix, for purposes of unrestricted marketing and sale (including import to and export from Switzerland);

(B)     On Count II of the Complaint, damages to be determined at trial, but in no case less than $8 million;

(C)     On Count III of the Complaint, damages to be determined at trial, but in no case less than $8 million;

(D)     On Count IV of the Complaint, damages to be determined at trial, including treble damages, in no case less than $24 million;

(E)     Interest, costs and disbursements, including reasonable attorneys' fees and disbursements, incurred in this action; and

(F)     Such other and further relief as this Court deems just and proper.

Dated: August 6, 2018

*/s/ Jessica Black Livingston*
Jessica Black Livingston
Andrew C. Lillie
Andrew M. Nussbaum
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202
Telephone: (303) 899-7300
Fax: (303) 899-7333
Email: jessica.livingston@hoganlovells.com
        andrew.lillie@hoganlovells.com
        andrew.nussbaum@hoganlovells.com

Georges G. Lederman (application for admission forthcoming)
William G. Pearlstein (application for admission forthcoming)
PEARLSTEIN MCCULLOUGH &
LEDERMAN LLP
641 Lexington Avenue, Suite 1327
New York, NY 10022
Telephone: (646) 762-2833/(646) 762-7264
Email: glederman@pmcounsel.com
        wpearlstein@pmcounsel.com

*Attorneys for Plaintiffs*